**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

OPTRONIC TECHNOLOGIES, INC.,
DBA Orion Telescopes &
Binoculars,

*Plaintiff-Appellee,*

v.

NINGBO SUNNY ELECTRONIC CO.,
LTD.,

*Defendant-Appellant,*

and

SUNNY OPTICS, INC.; MEADE
INSTRUMENTS CORP.; DOES, 1–25,

*Defendants.*

No. 20-15837

D.C. No.
5:16-cv-06370-
EJD

OPTRONIC TECHNOLOGIES, INC.,
DBA Orion Telescopes &
Binoculars,
                    *Plaintiff-Appellant,*

                    v.

NINGBO SUNNY ELECTRONIC CO.,
LTD.; SUNNY OPTICS, INC.; MEADE
INSTRUMENTS CORP.; DOES, 1–25,
                    *Defendants-Appellees.*

No. 20-15940

D.C. No.
5:16-cv-06370-
EJD

OPINION

Appeals from the United States District Court
for the Northern District of California
Edward J. Davila, District Judge, Presiding

Argued and Submitted August 31, 2021
Seattle, Washington

Filed December 6, 2021

Before:  A. Wallace Tashima and Ronald M. Gould, Circuit
Judges, and Jed S. Rakoff,[*] District Judge.

Opinion by Judge Gould

---

[*] The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

## SUMMARY[**]

**Antitrust**

The panel affirmed in part and vacated in part the district court's judgment, after a jury trial, in favor of Optronic Technologies, Inc., also known as Orion Telescopes & Binoculars, in Orion's lawsuit alleging that Ningbo Sunny Electronic Co. Ltd. and Sunny Optics, Inc., violated federal antitrust law and California laws.

Orion alleged that Sunny conspired with Suzhou Synta Optical Technology Co. Ltd. and other "Synta Entities" to fix prices and allocate the telescope market.

The panel held that the district court properly admitted the expert report and testimony of Drs. Jose Sasian and J. Douglas Zona, Orion's telescope manufacturing expert and damages expert, and properly excluded the testimony of Jeffrey Redman, a rebuttal expert for Sunny.

The panel held that the district court did not abuse its discretion by giving the jury a mid-trial curative instruction limiting the scope of the testimony of Dr. Celeste Saravia, a rebuttal expert on damages.

The panel held that Orion presented sufficient evidence to support the jury's verdict in Orion's favor on its Sherman Act § 1 claims. First, sufficient evidence supported the jury's verdict that Sunny conspired with horizontal competitor Synta to ensure that Sunny acquired Meade

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Instruments Corp., another telescope manufacturer, to protect their market share and guarantee that competitor Jinghua Optics & Electronics would not buy Meade. Second, sufficient evidence supported the jury's alternative findings that Sunny conspired with a competitor to fix prices or credit terms in violation of § 1. Third, sufficient evidence supported the jury's verdict that Sunny agreed with Synta, a horizontal competitor, either not to compete with one another in the market, or to divide customers or potential customers between them.

The panel held that the evidence supported the jury's verdict for Orion on its Sherman Act § 2 claims of attempted monopolization and conspiracy to monopolize the global telescope manufacturing market. The panel concluded that the jury's verdict imposing § 2 liability did not depend on an improper joint monopoly theory. The panel held that Orion sufficiently defined the relevant market through expert testimony by Dr. Zona. In addition, sufficient evidence supported the jury's findings that Sunny expressed a specific intent to gain monopoly power and was dangerously close to attaining monopoly power.

The panel affirmed the jury's verdict for Orion on its Clayton Act § 7 claim, based on the jury's finding of a reasonable likelihood that Sunny's acquisition of Meade would substantially reduce competition in the telescope manufacturing market or create a monopoly. The panel held that Sunny was not entitled to a new trial on the issue of § 7 liability because Orion presented evidence of antitrust injury, and the jury's finding as to damages was neither grossly excessive unsupported, nor the result of guesswork.

The panel held that the district court did not abuse its discretion in imposing injunctive relief against Sunny under Clayton Act § 16.

The panel held that Orion offered substantial evidence in support of the district court's finding that the conspiracy between Sunny and Synta continued post 2016, and Sunny was not entitled to judgment as a matter of law on the issue of whether Orion was entitled to post-September 2016 damages.

Vacating in part, the panel held that the district court abused its discretion by excluding under Fed. R. Civ. P. 26 and 37 the declaration that Dr. Saravia gave in support of Sunny's motion to alter or amend the judgment with regard to the valuation of a settlement set-off. The panel remanded for further proceedings.

On Orion's cross-appeal, the panel affirmed the district court's grant of summary judgment for Sunny on the issue of whether Sunny caused Orion's failure to acquire Meade.

**COUNSEL**

Karin Bohmholdt (argued) and Hannah B. Shanks-Parkin, Greenberg Traurig LLP, Los Angeles, California, for Defendant-Appellant.

J. Noah Hagey (argued), Matthew Borden, Jeffrey M. Theodore, Ronald J. Fisher, and Athul K. Acharya, BraunHagey & Borden LLP, San Francisco, California, for Plaintiff-Appellee.

**OPINION**

GOULD, Circuit Judge:

Optronic Technologies, Inc., also known as Orion Telescopes & Binoculars ("Orion"), filed a lawsuit alleging that Ningbo Sunny Electronic Co., Ltd. and Sunny Optics, Inc., collectively "Sunny," violated federal antitrust law and California laws. The case went to trial and the jury gave its verdict for Orion, awarding it $16.8 million in damages. Sunny appealed this verdict and several district court rulings. We have jurisdiction under 28 U.S.C. § 1291, and we affirm the jury's verdict. In so holding, we comment on the legal analysis a district court may use to resolve pre-and-post-trial motions in similar cases, and the evidence necessary to support a jury verdict in antitrust cases.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Parties

Orion is an American telescope company that designs and markets telescopes but does not make them. Sunny is a Chinese telescope manufacturer owned by Peter Ni, and

James Chiu controls Sunny's manufacturing activities. Orion alleged that Sunny violated federal antitrust law and related California laws by unlawfully conspiring with Suzhou Synta Optical Technology Co. Ltd. ("Suzhou Synta"), Synta Technology Corp. ("Synta Tech"), and Celestron Acquisition LLC ("Celestron"), collectively the "Synta Entities." Sunny and Suzhou Synta are two of the biggest manufacturers of telescopes sold in the United States. The relationship between Suzhou Synta and Synta Tech is disputed, but David Shen is the principal of both companies, collectively "Synta." Celestron is a Suzhou Synta subsidiary and the largest telescope distributor in the United States. Celestron made its own telescopes but stopped after being acquired by Synta. Joe Lupica was Celestron's CEO and CFO but resigned to work on Sunny's 2013 acquisition of Meade Instruments Corp. ("Meade"), another telescope manufacturer. Sunny hired Lupica as Meade's CEO.

## B. The Telescope Manufacturing Market

During the relevant time period, the key telescope distributors were Celestron, Meade, and Orion, whereas the main telescope manufacturers were Sunny, Synta, and Meade. Because most telescope manufacturers are private, market share data is not readily available. But public customs data show that, since 2012, Sunny and Synta have together accounted for up to 80 percent of telescopes imported into the United States. In 1991, the Federal Trade Commission ("FTC") blocked a proposed joint venture between Celestron and Meade. The FTC decided that this joint venture would "be a virtual monopolist in the manufacture and sale of [certain telescopes]." Meade had tried to acquire Celestron's assets in 2002, but the FTC prevented this deal "to maintain competition." In 2005,

Synta bought all of Celestron's assets, including its intellectual property, and moved Celestron's telescope manufacturing to Synta's factory in China.

## C.  The Meade Deal

Meade made itself available for purchase in early 2013. Orion offered $4.5 million, but Meade chose to proceed with a different $4.5 million offer from Jinghua Optics & Electronics ("JOC") and announced the proposed merger in May 2013.  Sunny intervened by submitting an unsolicited $5.87 million bid for Meade.  Meade terminated the JOC merger and accepted Sunny's offer.  Sunny created a holding company called Sunny Optics, to facilitate its acquisition of Meade.  Orion claims Celestron and Synta colluded with Sunny to help it acquire Meade.  The parties agree that a company called Sky Rainbow—which Orion insists is jointly owned by Peter Ni, the principal of Sunny, and David Shen, the principal of Synta—financed Sunny's acquisition of Meade.  Sunny also admits it reached out to Celestron— now owned by Synta—to request that Celestron pay for already-purchased telescopes faster than it was obliged to do.

## D.  The Hayneedle Deal

In 2014, Hayneedle, an e-commerce company, decided to sell certain website addresses—including telescopes.com, on which Celestron relied heavily—known as the "Haystack Assets."  Orion submitted the highest bid and signed a letter of intent with Hayneedle in May 2014.  The Synta Entities sent an email advising Orion that the Synta Entities were cutting off Orion's line of credit.  This email stated that "if Orion really buys Hayneedle, this will be the beginning of hazard [sic], we could not trust Orion's credit any more."  The Synta Entities forwarded this email to Sunny and asked

Sunny to also withdraw Orion's line of credit.  Sunny sent Orion an almost identical email.  Not surprisingly, Orion's deal with Hayneedle fell through.  Orion claims it was unable to acquire the Hayneedle Assets after Synta and Sunny cut off its lines of credit.

### E.  Procedural History

In September 2016, Orion entered into Settlement and Supply Agreements with the Synta Entities to resolve antitrust claims related to Sunny's acquisition of Meade. Orion then sent a demand letter to Sunny, after which Sunny stopped selling telescopes to Orion.  Orion filed this lawsuit on November 1, 2016.  The operative complaint set out four claims against Sunny and two of its subsidiaries: (1) price-fixing and collusion by competitors in violation of Sherman Act § 1; (2) attempted monopolization and conspiracy to monopolize in violation of Sherman Act § 2 and Clayton Act § 7; (3) violation of the California Unfair Competition Law ("UCL"); and (4) collusion to restrain trade in violation of California's Cartwright Act.  Orion also sought compensatory and punitive damages, disgorgement, divesture, injunctive relief, and restitution from Sunny.

Both parties moved for summary judgment.  The district court denied Orion's motion for summary judgment, but granted in part and denied in part Sunny's motion for summary judgment.  Orion's summary judgment motion alleged that Sunny had violated Sherman Act § 1 by conspiring with the Synta Entities to acquire Meade.  Sunny argued that Orion lacked standing on this claim because Orion would not have acquired Meade regardless of misconduct by Sunny or its subsidiaries.  The district court granted Sunny partial summary judgment on the issue of standing, holding "that Orion would not have acquired Meade in the absence of [Sunny's] alleged misconduct; JOC

would have." But the district court found that Orion may still have been harmed by Sunny's acquisition of Meade because it concentrated the telescope market "more than five times the amount presumed to enhance market power." The district court found a genuine issue of material fact as to whether Sunny and Synta had entered into an agreement that harmed competition. Sunny also obtained summary judgment on Orion's below-cost pricing and refusal to deal claims.

Before trial, Orion timely designated two expert witnesses, Jose Sasian, PhD., and J. Douglas Zona, PhD. Sunny did not timely disclose any expert witnesses, but later disclosed fraud examiner Jeffrey Redman and economist Celeste Saravia, Ph.D. as rebuttal experts. The parties cross-filed motions to exclude the other's experts. The district court denied Sunny's motion but granted Orion's motion to exclude Mr. Redman's testimony. It partially granted Orion's motion to exclude Dr. Saravia.

A six-week jury trial was held. Dr. Saravia testified at trial, and Orion objected that she was impermissibly offering affirmative damages testimony. The district court sustained this objection and instructed the jury that it was "not to consider [Dr. Saravia's] testimony as to any amount of damages nor her opinion as to damages." After Orion rested, Sunny moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). The district court denied this motion.

The jury reached a verdict on November 26, 2019. It found Sunny liable on all claims tried before it and awarded a total of $16.8 million in damages. Sunny and Meade filed for bankruptcy on December 4, 2019, and litigation was stayed as to them. The district court entered a partial judgment for Orion and against Sunny on December 5, 2019.

This partial judgment encompassed the Sherman Act §§ 1 and 2, Clayton Act § 7, California UCL, and California Cartwright Act claims, collectively the "Damages Claims." The district court then trebled the damages that were listed in the jury's verdict, under the Clayton Act § 4, 15 U.S.C. § 15, and awarded Orion $50.4 million on the Damages Claims.

Sunny renewed its motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and moved for a new trial under Federal Rule of Civil Procedure 59(a). The district court denied these motions. Sunny also moved to alter or amend the judgment under Federal Rule of Civil Procedure 59(e) to offset the value of the Settlement and Supply Agreements. The district court deducted $3.1 million from Orion's award, but did not offset any profits Orion derived from the Supply Agreement. In its view, Sunny had the burden of proof on this issue and the evidence that it offered to this end—a declaration by Dr. Saravia—was inadmissible as untimely under Federal Rules of Civil Procedure 26 and 37.

Orion moved for equitable relief and judgment on its UCL claim. The district court granted this motion, but reduced the scope of Orion's proposed injunction by ordering Sunny to: (1) supply Meade and Orion at non-discriminatory terms for five years; and (2) not communicate with Synta to the extent that such communication violated federal antitrust law.

On April 10, 2020, the United States Bankruptcy Court for the Central District of California permitted the district court to enter a final judgment against Defendants Sunny Optics and Meade, which the district court did five days later. Sunny timely appealed.

## II.  STANDARDS OF REVIEW

We review evidentiary rulings for abuse of discretion and will reverse only if incorrect evidentiary rulings were prejudicial. *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1017 (9th Cir. 2015).

A jury verdict will be upheld if supported by substantial evidence. *Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016).  "[W]e may not weigh the evidence but simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion."  *Id*.  Any underlying legal analysis or statutory interpretation is reviewed *de novo*. *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 814 (9th Cir. 2003).  But findings of fact will be reversed only when the evidence "permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict."  *Castro*, 833 F.3d at 1066.

We review *de novo* a district court's denial of a renewed motion for judgment as a matter of law.  *Id*.  We review for abuse of discretion a district court's rulings on motions to alter or amend a judgment, *Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 718 (9th Cir. 2005), motions for a permanent injunction, *Bank of Am. v. City & County of San Francisco*, 309 F.3d 551, 557 (9th Cir. 2002), and motions for a new trial, *City Sols., Inc. v. Clear Channel Commc'ns*, 365 F.3d 835, 843 (9th Cir. 2004).

## III.  SUNNY'S APPEAL

### A.

Sunny seeks reversal on the basis that the district court made three erroneous evidentiary rulings as to experts.  We disagree.

Sunny first challenges the district court's admission of the testimony of Dr. Sasian, Orion's telescope manufacturing expert. Dr. Sasian's testimony that Sunny and Synta could make the same telescopes supports an inference that Sunny and Synta are horizontal competitors. This inference is relevant because Orion alleged that Sunny and Synta conspired to fix prices and allocate the telescope market, which are *per se* antitrust violations when engaged in by horizontal competitors. *See Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 (1990); *Knevelbaard Diaries v. Kraft Foods, Inc.*, 232 F.3d 979, 986 (9th Cir. 2000).

Sunny argues that Dr. Sasian's testimony was "junk-science untethered to the facts of the case" because he only visited Celestron's factory for two hours roughly thirty-six years ago and relied on publicly available data from Orion's website. But Dr. Sasian's report and testimony explained how he used the product specifications of telescopes made by Sunny and Synta to determine that they could make each other's products. That these data were publicly available on Orion's website does not make Dr. Sasian's report untethered to the facts of this case.

Sunny also contends that Dr. Sasian's admission that 60% of his report was written by counsel gives grounds for reversal. Although the advisory notes to Federal Rule of Civil Procedure 26(a)(2)(B) permit counsel to assist experts in preparing reports, "the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness and it must be signed by the witness." The district court properly admitted Dr. Sasian's report because the parts written by counsel consisted of background information qualified by statements such as "I am informed that . . . ." Dr. Sasian also testified that he signed his report

after reviewing and editing it and determining that it accurately reflected his analysis and opinion with regard to the case.

Sunny further contends that Dr. Sasian was not qualified as an expert because he has made only "a couple of hobby telescopes." But the district court reasonably found that Dr. Sasian is qualified to testify as to whether it is technically feasible for Sunny and Synta to manufacture certain telescopes made by the other company. Dr. Sasian holds a Ph.D. in optical sciences, serves as an astronomy and optical sciences professor, has published research regarding the design, fabrication, and testing of various optical devices including telescopes, and previously worked at AT&T Bell Laboratories, where he personally oversaw the design and fabrication of lens systems.

We conclude that the district court properly admitted Dr. Sasian's expert report and testimony. *See United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (*en banc*) (holding that a district court abuses its discretion if it misapplies the law or makes a finding that is illogical, implausible, or without support in inferences which can be drawn from the record).

Sunny also disputes the district court's admission of the testimony of Dr. Zona, Orion's damages expert. Sunny maintains that Dr. Zona's testimony was insufficiently tied to the facts of the case because he relied on theoretical economic models instead of "actual data" and did not calculate the actual overcharges Sunny inflicted on Orion.

Dr. Zona used two methods—direct and structural—to calculate damages. For the direct method, Dr. Zona's elasticity, margin, and pass-through calculations were based on data from the telescope manufacturing market, but he

explained that the overcharges inflicted on Orion are not directly observable. Dr. Zona estimated these overcharges by looking to the number of alleged co-conspirators and considering the market shares of manufacturers in the relevant market. One method measured cartel overcharges from other conspiracies with similar market compositions, though Dr. Zona noted that his estimates could be conservative because the telescope market had so few buyers, which would likely magnify the overcharges. Dr. Zona separately looked to the structural theory of Cournot Equilibrium, an economic model where competitors simultaneously choose levels of output to maximize their profits. He adjusted this analysis to reflect the relevant market structure, of which two colluders—Sunny and Synta—controlled more than 70% of the market, based on data taken directly from this case. This Cournot Equilibrium model corroborated the results that Dr. Zona derived from his analysis of cartels operating in markets with compositions similar to the telescope market. Dr. Zona separately calculated damages through the structural method to check his direct method calculations. Dr. Zona's expert report and testimony were sufficiently tied to the facts of this case such that the district court properly admitted this evidence. *See Velazquez*, 793 F.3d at 1017; *Hinkson*, 585 F.3d at 1263.

The final pretrial evidentiary ruling that Sunny contests is the district court's exclusion of the testimony of Mr. Redman, one of Sunny's rebuttal experts. On appeal, Sunny argues that, although Mr. Redman is not an accountant or economist, he is qualified in these areas based on experience alone, and he should have been admitted because courts "routinely allow non-economists" to rebut expert economists such as Dr. Zona.

Sunny's arguments are unavailing.    Mr. Redman admitted that he did not grasp the meaning of the term "pass through" as used by Dr. Zona.  He also conceded that he was unfamiliar with the private cartel data that Dr. Zona used to estimate Orion's overcharges.  In addition, Mr. Redman had no experience with antitrust damages and had never calculated elasticity or overcharges in antitrust contexts. Mr. Redman stated that the structural model used by Dr. Zona is "out of [his] area of expertise," and his arguments for how to calculate an overcharge violated antitrust economic principles.  As the district court found, "Mr. Redman does not appear to understand the methods and models that Dr. Zona used."  We hold that the district court properly excluded testimony of Mr. Redman as to Dr. Zona. *See Hinkson*, 585 F.3d at 1263.   There was no abuse of discretion in this ruling.

**B.**

Sunny challenges the district court's mid-trial curative instruction limiting the scope of Dr. Saravia's expert witness testimony, contending that this ruling was an abuse of discretion.

At trial, Dr. Saravia, who was only a rebuttal expert, testified regarding her sensitivity analysis of Dr. Zona's damages calculations, in which she adjusted the parameters—*i.e.*, inputs—he used in his damages model by replacing them with alternative inputs that she deemed "more consistent with facts in the case."  Dr. Saravia testified that, after her adjustments, Dr. Zona's "estimate of damages . . . goes way down," as shown by a slide titled "Making Reasonable Adjustments Dramatically Lowers Dr. Zona's Damages."   Orion objected that Dr. Saravia had exceeded the bounds of rebuttal testimony by giving affirmative damages testimony.

The parties agreed that the district court had properly prohibited Dr. Saravia from presenting alternative damages estimates or models as part of her rebuttal testimony.  The district court gave a curative instruction, in which it advised the jury that it was striking Dr. Saravia's testimony to the extent that she had presented a lower measure of damages than the one calculated by Dr. Zona.  In issuing this curative instruction, the district court further explained to the jury that Dr. Saravia's criticisms of the methods used by Dr. Zona, as shown by her sensitivity analysis, were properly before the jury and could be considered, but that she was not permitted to provide an alternative estimate of her own.  The district court did not, as Sunny claims, tell the jury to ignore Dr. Saravia's testimony altogether.  Indeed, Sunny's counsel continued his direct examination of Dr. Saravia after the district court's curative instruction and clarified that she was only testifying as to her sensitivity analysis and not to an alternative measure of damages.  We therefore conclude that the district court did not abuse its discretion in giving its curative instruction on Dr. Saravia's damages testimony. *See United States v. Rodriguez*, 971 F.3d 1005, 1016 (9th Cir. 2020) (stating that "[t]he district court has substantial latitude in formulating jury instructions" (cleaned up)).

## C.

Sunny seeks reversal on the basis that Orion presented insufficient evidence to support three parts of the jury's verdict in Orion's favor on its Sherman Act § 1 ("Section 1") claims.  We reject these contentions.

By its terms, Section 1 bans every "contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 1.  The elements of a Section 1 claim are: (1) a contract, combination, or conspiracy; (2) "that

unreasonably restrained trade under either a *per se* rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001). To establish a conspiracy, the available evidence must tend "'to exclude the possibility' that the alleged conspirators acted independently." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Horizontal price fixing and market allocation are *per se* Section 1 violations. *See Palmer*, 498 U.S. at 49; *Knevelbaard Diaries*, 232 F.3d at 986.

Sunny first contends that substantial evidence does not support the jury's verdict that Sunny conspired with horizontal competitor Synta to ensure that Sunny acquired Meade to protect their market share and guarantee that competitor JOC would not buy Meade. If proven, that would be a *per se* Section 1 violation. *See Helix Milling Co. v. Terminal Flour Mills Co.*, 523 F.2d 1317, 1322 (9th Cir. 1975).

At trial Orion offered evidence from which the jury could conclude that Peter Ni, David Shen, and other Synta executives discussed, before Sunny submitted its bid for Meade, arranging a transaction in which Sunny would acquire Meade. An email between Ni, Shen, and other Synta executives states that Sunny bought Meade "to prevent JOC to buy Meade," and Synta executives agreed that Celestron—which was owned by Synta—and Synta would "provide[] the financial support to Sunny" for its purchase of Meade. Orion also presented evidence that Synta did in fact provide such financial support. Specifically, Celestron made $7.2 million in "prepayments" to Sunny for unshipped telescopes, and gave Sunny $10 million in interest-free loans to fund Meade's operations, Indeed, Orion offered evidence

that Sunny's purchase of Meade was financed by funds provided by Sky Rainbow, an entity jointly owned by Ni and Shen.  Orion further pointed out that Celestron and Synta received interests in Meade equivalent to the funds they provided for Sunny's acquisition of Meade, which signaled that Sunny rewarded Celestron and Synta for this financial support.  The jury also viewed evidence that Celestron executives ran Sunny's acquisition of Meade.  In 2013, Celestron's CEO resigned to consult Sunny on the Meade deal then became the CEO of Meade.  Sunny also instructed the lawyers who represented it in the Meade deal to take advice from Shen.

Orion also offered evidence from which the jury could infer that Sunny's acquisition of Meade was part of a larger scheme in which Sunny and Synta aimed to jointly control the telescope market notwithstanding that federal regulators had already prohibited such a combination.  After former Celestron CEO Joe Lupica became the CEO of Meade, he sent an email indicating that the owners of Sunny and Synta—Peter Ni and David Shen—had a "vision of how the four companies are to cooperate for the benefit of the entire group of companies."  Lupica later sent another email stating that "[i]f we take advantage of the strong relationships among Sunny, Synta, Celestron and Meade (under Peter's ownership), we can quickly turn the company around and the four companies can dominate the telescope industry."  To this end, Lupica insisted that "we need to have one senior management team managing Meade and Celestron."  And the evidence was such that the jury could infer that Lupica was aware that the FTC had blocked two prior attempts to merge Celestron and Meade because the combined entity would be "a virtual monopolist in the manufacture and sale of [certain telescopes]."

We thus hold that substantial evidence supports the jury's verdict that Sunny and Synta conspired to acquire Meade to protect their market share and stop a competitor from buying Meade. *See Castro*, 833 F.3d at 1066.

Sunny also challenges the jury's alternative findings that Sunny conspired with a competitor to fix prices or credit terms in violation of Section 1.  But the jury could infer from the evidence that Synta controls an entity called Good Advance, and that Sunny and Synta conspired to fix the prices that they charged Orion and Synta's subsidiary Celestron using Good Advance.  Orion offered evidence that Good Advance uses the name "Taiwan Synta," and Sunny admits that Joyce Huang, Good Advance's only employee, works for Synta Tech.  Also, the evidence showed that Huang worked for Synta owner David Shen, who gave direction to Good Advance, and Good Advance has the same business address as Synta and Sky Rainbow, the entity that transferred the funds that Sunny used to purchase Meade.

Orion also offered specific price-fixing evidence at trial. Synta asked Sunny: "Is Sunny's AZ GOTO mount the same as that Suzhou used?  If so, please re-check your price. Suzhou's 2013 list price of AZ GOTO mount [and] steel tripod was US $140."  Sunny sent an email to Huang stating that it was "considering . . . adopting different product prices to protect Celestron."  Huang, who worked for Synta's David Shen, told Sunny to raise the prices it charged Orion to match the prices that Synta was charging Orion.  Sunny agreed.  Price lists showed that Sunny charged Orion fifty percent more than it charged Synta subsidiary, Celestron, for identical items.  Substantial evidence therefore supports the jury's verdict that Sunny and Synta committed a *per se* Section 1 violation by conspiring to fix the prices that they

charged Synta's subsidiary Celestron and Orion.  *See Castro*, 833 F.3d at 1066; *Knevelbaard Diaries*, 232 F.3d at 986.

With regard to fixing credit terms, which is a form of price fixing and a *per se* Section 1 violation, *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648 (1980), the jury could infer from the evidence adduced at trial that Sunny and Synta engaged in such behavior in retaliation for Orion's Hayneedle deal.  Orion offered the highest bid to Hayneedle for the Haystack Assets, including the telescopes.com website address on which Synta's subsidiary Celestron relied, and Orion then signed a letter of intent with Hayneedle.   The Synta Entities then sent an email terminating Orion's line of credit.   The Synta Entities forwarded this email to Sunny and asked Sunny to withdraw Orion's line of credit.  Sunny sent Orion a credit termination email nearly identical to the one sent by the Synta Entities. These emails both stated that Sunny and Synta were revoking Orion's credit because Orion was buying the Haystack Assets.  These emails also stated that Sunny and Synta would no longer allow Orion to receive telescope shipments in advance of payment.   Because substantial evidence supports the jury's verdict that Sunny and Synta fixed credit terms in violation of Section 1, we affirm this finding.  *See Castro*, 833 F.3d at 1066; *Catalano*, 446 U.S. at 648.

Sunny argues that there was not substantial evidence to support the jury's verdict that Sunny agreed with Synta, a horizontal competitor, either not to compete with one another in the market, or to divide customers or potential customers between them.  Such conduct constitutes illegal market allocation, which is a *per se* Section 1 violation.  *See Palmer*, 498 U.S. at 49.  We disagree.

The documentary evidence and expert testimony that Orion presented during trial—particularly Dr. Sasian's testimony regarding overlapping production capabilities— showed that Sunny had the technical capability to manufacture the same telescopes as Synta, but chose not to. Two internal emails mentioned "consider[ing] how to avoid conflict with Celestron's products," and "divid[ing] the products and sell[ing] them to different markets to reduce conflicts." Other emails between Sunny and Synta indicate that they had agreed to divide customers. For instance, in a December 2013 email, Synta's Shen told Sunny that:

> Bidding with Costco between May and June (compete with Celestron for the price). This is a very important issue. This need Director Ni to communicate face-to-face with DAVE when he goes to the United States. Don't bid. If you let the thing go by doing this, how would you deal with everything in the future? All products are produced by Sunny. Following a conflict, Celestron would not trust Sunny any longer.

This is quintessential evidence of a market allocation conspiracy. We accordingly conclude that substantial evidence supports the jury's verdict that Sunny engaged in *per se* illegal market allocation with Synta. *See Castro*, 833 F.3d at 1066; *Palmer*, 498 U.S. at 49.

## D.

Sunny also seeks reversal on the basis that the evidence does not support the jury's verdict for Orion on its Sherman Act § 2 ("Section 2") claims. We disagree. Section 2 makes it illegal to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to

monopolize any part of the trade or commerce . . . ." 15 U.S.C. § 2.   While Section 1 "targets concerted anticompetitive conduct, [Section 2] targets independent anticompetitive conduct." *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 989–90 (9th Cir. 2020). Monopoly power itself is not unlawful—instead, it must be "accompanied by an element of anticompetitive conduct" to trigger Section 2 liability. *Id*. at 990.

The jury found Sunny liable for attempted monopolization and conspiracy to monopolize under Section 2.  Attempted monopolization requires: "(1) specific intent to monopolize a relevant market; (2) predatory or anticompetitive conduct; and (3) a dangerous probability of success." *Catlin v. Wash. Energy Co.*, 791 F.2d 1343, 1348 (9th Cir. 1986).  Conspiracy to monopolize requires: "(1) an agreement or understanding between [alleged conspirators]; (2) a specific intent to monopolize; and (3) overt acts in furtherance of the alleged conspiracy." *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 516 F. Supp. 2d 324, 341 (D. Del. 2007), *aff'd*, 602 F.3d 237 (3d Cir. 2010).

We first reject Sunny's argument that Orion improperly pursued a "joint monopoly theory" at trial.  The district court's jury instruction on conspiracy to monopolize required Orion to show that "[Sunny or its subsidiaries] specifically intended that *one of the partie*s to the agreement would obtain or maintain monopoly power in the telescope and accessory manufacturing market."  It is true that this jury instruction does not specify which entity—Sunny or Synta— the parties to the agreement intended would achieve or maintain monopoly power, but Sunny agreed to the jury instructions in advance and did not object to this lack of clarity.  Moreover, there is substantial evidence that Sunny was dangerously close to acquiring monopoly power, and

the jury could have found that the parties intended for Sunny to have a monopoly over the telescope manufacturing market.  We therefore conclude that the jury's verdict imposing Section 2 liability does not depend on a joint monopoly theory.

Sunny's contentions that Orion could not prevail under Section 2 for failure to define the relevant market are similarly unavailing.  To define a market, the district court must determine: (1) "the field in which the plaintiff was engaged . . . in geographic and distributional terms," and (2) "the product (or product line) that competes in that field." *JBL Enters., Inc. v. Jhirmack Enters., Inc.*, 698 F.2d 1011, 1016 (9th Cir. 1983).  The relevant market is defined as the "commodities reasonably interchangeable by consumers for the same purpose."  *Id*.  We review relevant market definitions as fact findings reversible only if the evidence compels a conclusion contrary to the jury's verdict.  *Id*.

Orion established the relevant market through expert testimony by Dr. Zona.  Sunny claims this was insufficient because Dr. Zona did not analyze the cross-elasticity of demand between the product and substitutes, conduct a SSNIP[1]     analysis,     independently     analyze     whether

---

[1] SSNIP is a common methodology for defining a relevant antitrust market.  To perform a SSNIP analysis, an economist proposes a narrow geographic and product market definition and then iteratively expands that definition until a hypothetical monopolist in the proposed market would be able to profitably make a small but significant non-transitory increase in price ("SSNIP").  At each step, if consumers would respond to a SSNIP by making purchases outside the proposed market definition, thereby rendering the SSNIP unprofitable, then the proposed market definition is too narrow.  At the next step, the economist expands the proposed geographic or product market definition to include the substituted products or area.  This process is repeated until a SSNIP in

manufacturers can produce both high-and-low-end telescopes, explain why the market included accessories, or evaluate substitutes to the telescope manufacturing market.

These contentions are without merit. Sunny acknowledges that there is no requirement to use any specific methodology in defining the relevant market. Dr. Zona testified that there was no need to perform a SSNIP analysis because the global telescope and telescope accessory manufacturing market is so broad— geographically unbounded and encompassing all products potentially substituted for or sold with telescopes—that the key question is whether a new manufacturer, such as an automaker, could enter the telescope market quickly enough to offset a SSNIP imposed by a hypothetical monopolist. As such, Dr. Zona determined reasonably that he could forgo a SSNIP analysis in favor of his barriers to entry analysis. Dr. Sasian testified that Sunny and Synta had the technical capacity to make high-and-low-end telescopes, so Dr. Zona did not need to independently determine that as part of his antitrust economic analysis. Dr. Zona further testified that his market definition included telescope accessories because buyers purchase them with telescopes and they are often shipped together to save money. *See JBL Enters.*, 698 F.2d at 1016 (explaining that the relevant product may also include "a 'cluster' or 'product line' of one manufacturer [if it] is reasonably interchangeable for that of another by the [distributor] that is making the purchase"). Dr. Zona finally testified that there is no real substitute for telescope manufacturing. No basis for reversal on market definition

---

the proposed market is predicted to be profitable for the hypothetical monopolist. *See St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys.*, Ltd., 778 F.3d 775, 784 (9th Cir. 2015).

therefore exists here.  *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).

Regarding the sufficiency of the evidence, Sunny takes the position that "no evidence" supports the jury's finding that Sunny expressed a specific intent to gain monopoly power.  We disagree.

Courts use the specific intent element to limit "the reach of an attempt claim to conduct threatening monopolization." *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1027 (9th Cir. 1981).  A plaintiff may establish specific intent to monopolize through either direct evidence of "unlawful design" or circumstantial evidence "principally of illegal conduct." *Id*.  This "inference may be drawn from conduct . . . with an unreasonable restraint of trade in violation of section 1 of the Sherman Act." *Id*. at 1028.

As explained above, substantial direct evidence of unlawful design supports the jury's Section 1 finding that Sunny had a specific intent to seize control of the telescope and accessory manufacturing market by acquiring Meade. The email in which Sunny stated that it purchased Meade "to prevent JOC to buy Meade," for instance, establishes that Sunny's specific intent was to prevent JOC, the third-largest competitor in the telescope and accessory manufacturing market, from becoming a stronger competitor.  In addition, and as explained above, the evidence supports the jury's conclusion that Sunny unlawfully conspired with Synta to prevent JOC, a new, smaller competitor, from buying Meade.  Orion also presented evidence that Sunny told the FTC Shen was not involved in its Meade acquisition, when, at the very least, Sky Rainbow, which Shen partially owned, funded Sunny's acquisition of Meade.  This Section 1 violation also supports a finding of specific intent to

monopolize.  *See William Inglis & Sons Baking Co.*, 668 F.2d at 1028.

Sunny attempts to pre-empt this analysis by suggesting that Synta would have no motive to help Sunny acquire monopoly power because that would give Sunny the power to dictate prices and market economies over Synta.  We are not persuaded.  Because Synta is a horizontal competitor of Sunny, Synta would benefit from Sunny's ability to raise prices because Synta could raise its own prices in turn.  *See Matsushita Elec. Indus. Co.*, 475 U.S. at 583 ("[C]ompetitors . . . stand to gain from any conspiracy to raise the market price.").  And the jury could have inferred that Synta agreed to help Sunny acquire Meade because it expected to receive favorable wholesale pricing for Celestron-branded products and to engage in the market allocation scheme addressed in Orion's Section 1 claims. Orion also offered evidence that Celestron was aware that its conduct was, or could be perceived as anticompetitive. Celestron provided $7.2 million in "prepayments" to Sunny for unshipped telescopes to support Sunny's acquisition of Meade, and Celestron admitted that it would need to revert to its usual course of dealing with Sunny to avoid unwanted suspicion.  We therefore hold that substantial evidence supports the jury's verdict that Sunny demonstrated the specific intent to monopolize necessary for Section 2 liability.  *See id.*; *Castro*, 833 F.3d at 1066; *William Inglis*, 668 F.2d at 1027.

Sunny finally suggests that the evidence Orion offered at trial did not establish that Sunny was dangerously close to attaining monopoly power.  This contention is unavailing and does not warrant reversal.

Monopoly power is the ability to "control prices" or "exclude competition" in the relevant market.  *Image Tech.*

*Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202, 1206 (9th Cir. 1997). It can be proven by direct or circumstantial evidence. *Id*. at 1202. The latter approach requires plaintiffs to "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Id*. A market share of sixty-five percent or more usually establishes a prima facie case of monopoly power in Section 2 contexts. *Id*. at 1206 (citation omitted). But "the minimum showing of market share required in an attempt case is a lower quantum than the minimum showing required in an actual monopolization case." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995). We have held that a market share as low as forty-four percent is sufficient to support a finding that a party was dangerously close to monopoly power where barriers to entry were high and competitors could not expand their short-run output. *Id*.

The evidence Orion presented at trial, including Dr. Zona's expert testimony, established that Sunny's market share was around fifty percent and reached its peak of sixty-three percent in 2013. Sunny's citations to its 2017 market share of about thirty-three-and-a-half percent, are inapposite because, by 2018, Sunny's market share was just over forty-nine percent, above the forty-four percent mark that we have recognized to be sufficient to establish a dangerous proximity to market power. *See id*. Dr. Zona testified that there are high barriers to entry in the telescope manufacturing market, and that this market is highly concentrated. Orion also presented evidence that there had been no new entrants into the telescope manufacturing market for ten years, corroborating Dr. Zona's conclusion that there are high barriers to entry in the telescope

manufacturing market.  After Sunny bought Meade, Sunny became the largest telescope manufacturer in the world. Sunny's forty-nine percent market share could have risen more if it had gotten Meade's telescope manufacturing plant up to speed.  Substantial evidence therefore supports the jury's finding that Sunny was dangerously close to monopoly power such that it could be held liable under Section 2.  *See Castro*, 833 F.3d at 1066; *Rebel Oil*, 51 F.3d at 1438.

None of Sunny's attacks successfully undermines the jury's verdict finding that Sunny unlawfully conspired to monopolize the global telescope manufacturing market in violation of Section 2 of the Sherman Act.  Accordingly, the Section 2 verdict stands.

## E.

Orion prevailed on its Clayton Act § 7 ("Section 7") claim because the jury found a reasonable likelihood that Sunny's acquisition of Meade would substantially reduce competition in the telescope manufacturing market or create a monopoly.  Sunny seeks a new trial on the basis that Orion did not prove damages from this violation of Section 7. Once more, we disagree.

Section 7 prohibits mergers that tend "substantially to lessen competition" or "create a monopoly."  15 U.S.C. § 18. "To establish a prima facie [Section 7] case, [a plaintiff] must (1) propose the proper relevant market and (2) show that the effect of the merger in that market is likely to be anticompetitive."  *Fed. Trade Comm'n v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337–38 (3d Cir. 2016).  A new trial may be granted where there is "no evidence on the amount of damages attributable only to the antitrust violation."  *Farley Transp. Co. v. Santa Fe Trail Transp.*

*Co.*, 786 F.2d 1342, 1351 (9th Cir. 1985). But "[t]he district court's denial of the motion for a new trial is reversible only if the record contains no evidence in support of the verdict." *Id*. at 1347. Once a plaintiff establishes "the fact of antitrust injury," we must uphold the jury's finding as to the amount of damages unless that finding is "'grossly excessive or monstrous,' clearly not supported by the evidence, or 'only based on speculative guesswork.'" *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1287 (9th Cir. 1984) (citation omitted).

Orion presented evidence of antitrust injury on its Section 7 claim during trial. The theory that Orion set out to the jury was that Sunny's acquisition of Meade reduced the number of major telescope manufacturers from three to two. This manufacturer consolidation further concentrated the already highly concentrated telescope manufacturing market by causing its Herfindahl-Hirschman Index ("HHI")—a widely accepted measure of market concentration—to increase by over 1,000 points, or five times the amount that is presumptively anticompetitive. *See St. Alphonsus Med. Ctr.*, 778 F.3d at 788. By acquiring Meade, Sunny gained increased control over telescope manufacturing, which enabled Sunny and its competitors to charge supracompetitive prices for telescopes. This was a major factor in the overcharges that Orion experienced in its business dealings with Sunny, Synta, and Meade. Sunny tries to counter this analysis by arguing that Orion's expert Dr. Zona testified that the overcharges Orion had to pay did not result from Sunny's acquisition of Meade. But this mischaracterizes Dr. Zona's testimony. Dr. Zona only confirmed that his damages calculation excluded damages Orion sustained from its failure to acquire Meade. He did not state that Orion was undamaged by supracompetitive prices arising from the merger. Because Orion presented

evidence of antitrust injury, and because the jury's finding as to damages was neither grossly excessive, unsupported, nor the result of guesswork, Sunny is not entitled to a new trial on the issue of Section 7 liability.  *See Handgards*, 743 F.2d at 1287.

## F.

The district court entered injunctive relief against Sunny under Clayton Act § 16 ("Section 16"), 15 U.S.C. § 26, and the UCL.  Sunny claims this injunction is overbroad.  We review for abuse of discretion a grant of a permanent injunction and any decision "underlying the imposition of the injunction is reviewed by the standard that is appropriate to that determination." *Bank of Am.*, 309 F.3d at 557.

Sunny suggests the district court's injunction does not flow from conduct that violated the antitrust laws, implying that whether the banned conduct violates antitrust law is a legal issue underlying the grant of injunctive relief and subject to *de novo* review.  That suggestion is incorrect.

Section 16 authorizes injunctive relief against any "threatened loss or damage by a violation of the antitrust laws."  15 U.S.C. § 26.  Such relief must be based on a "clear indication of a significant causal connection between the conduct enjoined or mandated and the violation found directed toward the remedial goal intended." *United States v. Microsoft Corp.*, 253 F.3d 34, 105 (D.C. Cir. 2001) (quotation marks omitted).  But a district court may order an injunction "beyond a simple proscription against the precise conduct previously pursued." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 698 (1978).  The reviewing court only asks if "the relief [is] a reasonable method of eliminating the consequences of the illegal conduct." *Id*.  If the jury finds that monopolization or attempted

monopolization has occurred, the available injunctive relief is broad, including to "terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future." *Microsoft*, 253 F.3d at 103; *accord Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (holding that antitrust relief must restore competition).

There was no error. Sunny's decision to forgo profits by refusing to supply Meade was proof of its intent to restrain competition. And the telescope manufacturing market would become overconcentrated if Sunny eliminated Meade as a competitor. The district court validly ordered Sunny to supply Meade on non-discriminatory terms. This injunction will help ensure that Sunny does not engage in practices "likely to result in monopolization in the future." *Microsoft*, 253 F.3d at 103.

Sunny similarly claims that the district court improperly granted relief on Orion's refusal-to-deal claim, which was dismissed on summary judgment, when it ordered Sunny to supply Orion on non-discriminatory terms. But the district court can order conduct to "avoid a recurrence of the [antitrust] violation and to eliminate its consequences. *Prof'l Eng'rs*, 435 U.S. at 698. As explained above, the jury properly found that Orion had been forced to pay inflated prices as a result of the market power exerted by Sunny and Synta following the unlawful Meade acquisition. The district court thus properly fashioned a "reasonable method of remedying the harm to [Orion] caused by [Sunny's] attempted monopolization and ensuring that [Sunny's] violations of antitrust law do not recur" with regard to Orion by ordering Sunny to supply Orion on non-discriminatory terms.

Sunny, citing *Kodak*, argues that the district court's order to supply Orion and Meade on non-discriminatory terms is inappropriate because it will result in a windfall for Orion and so may create an oligopoly. *See* 125 F.3d at 1224–26. But in *Kodak*, the defendant challenged various requirements of an injunction insofar as they required nondiscriminatory sales of parts to non-party competitors, and we affirmed that "[i]njunctive relief covering nonpart[ies] . . . is proper" to prevent future Sherman Act violations. *Id.* at 1226. Sunny is now making the opposite argument: that injunctive relief requiring an antitrust defendant to deal on a nondiscriminatory basis is only appropriate if it applies to the defendant's interactions with all market participants. *Kodak* imposes no such requirement. The district court acted within its discretion in finding that, under the facts of this case, extending injunctive relief only to Orion and Meade would enhance, not stifle, competition. *See Ford*, 405 U.S. at 573 (explaining that, in antitrust cases involving injunctive relief, district courts have broad discretion to "fit the decree to the special needs of the individual case" (quotation marks omitted)). We decline to conclude that the district court abused its discretion in fashioning injunctive relief it deemed appropriate to prevent a recurrence of the antitrust violations, or to remand this case based on the scope of the injunction. *See Prof'l Eng'rs*, 435 U.S. at 698; *Ford*, 405 U.S. at 573; *Microsoft*, 253 F.3d at 103.

## G.

In connection with the antitrust claims at issue here, Orion and Synta entered into the Settlement and Supply Agreements in 2016, and Synta also agreed to supply Orion on most favored customer terms. Sunny also stopped supplying Orion in 2016. Sunny challenges the district

court's finding that its conspiracy with Synta could have continued past 2016 and seeks judgment as a matter of law on the issue of whether Orion is entitled to post-September 2016 damages.

The parties disagree on who bore the burden of proof on this issue. Regardless, Orion offered substantial evidence that the conspiracy between Sunny and Synta continued past 2016 because Synta kept overcharging Orion instead of giving Orion the most favored customer rate, leading Orion to pay more for telescopes than it had before its agreements with Synta. This evidence also showed that Sunny stopped supplying Orion. These acts to raise Orion's costs are suggestive of a continued conspiracy.

But even if the conspiracy between Sunny and Synta to eliminate Meade as an independent competitor ended in 2016, when Orion and Synta signed the Settlement and Supply Agreements, Orion could still recover post-2016 damages because it continued to suffer economic harm from the harm to competition caused by the illegal concerted activity. See *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1366 (9th Cir. 1986) ("[A] plaintiff need not prove that the antitrust violation was the only cause of its injury in order to recover damages[;] proof that the violation was a material cause is sufficient."). The purpose of Sunny and Synta's conspiracy was to prevent JOC from acquiring Meade and to eliminate Meade as an independent competitor in the market for telescope and telescope accessories manufacturing. This conspiracy achieved its objective: a highly concentrated market with fewer competitors and higher costs for telescope brands not yet controlled by the co-conspirators. Orion's antitrust post-2016 injuries arose directly from the change in market structure that resulted from the conspiracy's successful

elimination of Meade as an independent competitor. When Sunny decided to stop supplying Orion, Synta exploited its market power to charge Orion higher prices. Orion nonetheless continued buying approximately seventy-five percent of its telescopes from Synta because it lacked viable alternate suppliers in the highly concentrated market. This is consistent with Dr. Zona's testimony; he explained that structural changes to the telescope manufacturing market brought about by the conspiracy continued to impose costs on Orion after 2016, and he was able to estimate those costs.

Therefore, where an antitrust plaintiff suffers continuing antitrust injuries from anticompetitive changes to market structure that arose from a proven antitrust violation, we hold that the violation may be a material cause of that injury, and so recovery of damages is permitted, even after the last proven date of the violative conduct. This rule accords with the common-sense principle that "if you break it, you buy it." If a defendant has conspired to violate the antitrust laws and thereby harmed a market's competitive structure, it remains liable for the continuing injuries suffered by plaintiffs from the structural harm to competition that its unlawful scheme brought about. It is no defense to argue that the conspiracy has ended, where the conspiracy achieved its anticompetitive objective. As a result, Orion could prevail by showing that an overt pre-2016 conspiracy had residual market effects that resulted in post-2016 damages.

The district court properly found that Sunny was not entitled to judgment as a matter of law on post-2016 damages. The jury could have found that Sunny and Synta continued conspiring after 2016 or that Orion's post-2016 damages were a residual effect of a pre-2016 conspiracy

between Sunny and Synta.  *See Castro*, 833 F.3d at 1066. Either would suffice to affirm.

## H.

Sunny contends the district court improperly excluded a declaration by Dr. Saravia in ruling on its post-trial motion to alter or amend the judgment.  In the district court's view, this declaration fell within the scope of Federal Rule of Evidence 702, and was inadmissible as untimely under Federal Rules of Civil Procedure 26 and 37.

But Rule 26 states that "a party must disclose to the other parties the identity of any [expert] witness it may use at trial . . . ."  FED. R. CIV. P. 26(a)(2)(A).  If a scheduling order is issued, experts must be disclosed "at the times and in the sequence that the court orders."  FED. R. CIV. P. 26(a)(2)(D). Here, the district court entered a pre-trial scheduling order that set a May 31, 2019 deadline for disclosure of rebuttal experts.  Sunny timely disclosed Mr. Redman and Dr. Saravia as rebuttal experts.  And there is no evidence that Sunny did not attach written reports to these disclosures. FED. R. CIV. P. 26(a)(2)(B).  Indeed, Orion's motion to exclude Dr. Saravia's testimony takes issue with her written report.  As such, the district court could not apply the rule that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a)[,] the party is not allowed to use that information or witness to supply evidence on a motion" with regard to Dr. Saravia.  FED. R. CIV. P. 37(c)(1).

We hold that the district court abused its discretion by excluding under Federal Rules of Civil Procedure 26 and 37 the declaration that Dr. Saravia gave in support of Sunny's motion to alter or amend the judgment.  *See Yokoyama v. Midland Nat'l. Life Ins. Co*., 594 F.3d 1087, 1091 (9th Cir. 2010).   We express no opinion on whether Dr. Saravia's

declaration is admissible under Federal Rule of Evidence 702 because the district court should address that issue in the first instance. *See Singleton v. Wulff*, 428 U.S. 106, 120–21 (1976). We remand for further proceedings consistent with this opinion.

## IV.  ORION'S CROSS-APPEAL

Orion cross-appeals the district court's entry of summary judgment for Sunny on the issue of whether Sunny caused Orion's failure to acquire Meade. But Orion must have antitrust standing, consisting of the "(1) injury of the type the antitrust laws were intended to prevent that also (2) flows from that which makes defendants' acts unlawful." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 922 (9th Cir. 2015) (cleaned up). And monetary recovery "will not be permitted for injuries . . . independently caused by something other than the antitrust violation." *Nat'l Football League*, 791 F.2d at 1366.

The relevant facts are that, in February 2013, Orion offered $4.5 million to acquire Meade. Meade chose a different higher offer from JOC. In April 2013, JOC reduced its offer from $5 million to $4.5 million, so Meade re-opened the bidding process. In May 2013, Meade reached out to Orion and stated that it no longer had an exclusive merger agreement with JOC. But Orion declined to submit another offer to buy Meade at that time. JOC later offered $4.5 million to purchase Meade, and Meade accepted. The merger between JOC and Meade was announced on May 17, 2013. Sunny later made an unsolicited $5.87 million bid to acquire Meade, so Meade abandoned its second deal with JOC to accept Sunny's offer.

Orion claims that a reasonable jury could have found in its favor because: (1) JOC's second bid for $4.5 million was

the same amount as Orion's bid; (2) JOC had backed out of buying Meade once; and (3) Orion had more to gain from purchasing Meade than JOC did and so it might have increased its bid to ensure that it acquired Meade. These arguments are unavailing because they do not properly account for the timing of bids. Most importantly, when Orion was informed that Meade's deal with its prior high bidder was off, Orion declined to even submit a bid to buy Meade. Orion's decision not to submit a new offer to Meade creates a strong presumption that Orion would not have acquired Meade even if Sunny had not outbid JOC for Meade. Orion offered no evidence Meade would have accepted a higher bid from Orion after announcing its $4.5 million deal with JOC, or that Meade would have terminated this deal for reasons other than Sunny's bid. There was no genuine dispute of material fact on whether Sunny prevented Orion from buying Meade. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

**VACATED in part only with regard to the valuation of the settlement set-off, which is REMANDED for further proceedings consistent with this opinion. AFFIRMED with regard to all other issues. We AWARD costs on appeal to Orion.**